Kathryn RINK, et al., Plaintiffs and
Proposed Class Representatives,

v.

CHEMINOVA, INC., et al., Defendants.

No. 8:99–CV–1097–T–26TBM.

United States District Court,
M.D. Florida,
Tampa Division.

Oct. 31, 2001.

Bryan K. McMinn, Maher, Guiley & Maher, P.A., Michael David Crosbie, Foley & Lardner, Orlando, FL, Gladstone N. Jones, Joseph H. Hart, IV, Spiro J. Verras, Smith, Jones & Fawer, L.L.P., New Orleans, LA, Val Patrick Exnicios, Liska, Exnicios & Nungesser, New Orleans, LA, Brian Stuart Koukoutchos, Law Office of Brian S. Koukoutchos, Mandeville, LA, for Kathryn Rink, individually and as parent, natural guardian and next friend of Jason Rink and Adam Rink, both minors, and on behalf of all persons similarly situated in the State of Florida, plaintiffs.

Thomas M. Burke, Holland & Knight, LLP, Orlando, FL, G. Calvin Hayes, Joseph H. Varner, III, Randal R. Craft, Jr., Christopher G. Kelly, Holland & Knight, LLP, New York City, for Cheminova, Inc., Cheminova A/S, successor to Cheminova Agro A/S fka Cheminova Agro A/S, Auriga Industries A/S, successor to Cheminova Holding A/S fka Cheminova Holding aka Auriga Industries, defendants.

### *ORDER*

LAZZARA, District Judge.

Before the Court is the Report and Recommendation of Magistrate Judge Thomas

B. McCoun, III (Dkt.301), recommending that the Plaintiff's Motion to Certify Class (Dkt.37), as supplemented (Dkt.187), be denied. The Plaintiffs have filed Objections (Dkt.312), and the Defendants have filed a Response (Dkt.318) to those objections. After carefully considering the motion as supplemented, the Defendants' responses to the motion (Dkts. 73 & 216), the Report and Recommendation, the Plaintiff's Objections, the Defendants' Response, the parties' numerous submissions in support of their respective positions, and the transcript of the class certification hearing held before Judge McCoun on March 29, 2001 (Dkt.324), the Court concludes that the Report and Recommendation should be confirmed and approved in all respects and made a part of this order for all purposes, except as may be noted otherwise in this order.[1]

■ After a careful review of the Plaintiffs' Objections, it is readily apparent to this Court that the only dispute they have with regard to Judge McCoun's thorough and well-reasoned Report and Recommendation is his unwillingness to recommend certification of one or more issues for class action maintenance under Federal Rule of Civil Procedure 23(c)(4)(A) which provides in pertinent part that "[w]hen appropriate (A) an action may be brought or maintained as a class action with respect to particular issues[.]" They maintain that the proposed class "was remarkably apt for certification as to particular issues pursuant to 23(c)(4)(A), Fed.R.Civ.P."[2] The Plaintiffs frame these specific issues in terms of whether the Defendants "delivered a defective product to Florida for use in the Medfly Eradication Program, along with the defendants' attendant defenses[.]"[3] They make it clear that they do not seek class certification under this rule of individual issues of causation and harm because of disparities as to damages and causation.[4]

The Defendants respond that class certification even under the auspices of rule 23(c)(4)(A) is inappropriate because "there is no single issue common to the class Plaintiffs seek to certify."[5] They argue in that regard that because the Plaintiffs have apparently conceded "that individual issues of causation and damages predominate over their claimed questions of liability[,]" the Plaintiffs cannot utilize rule 23(c)(4)(A) as the basis for class certification because that rule does not permit such certification in the absence of predominance.[6] They rely primarily on the case of *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir.1996), in support of their argument.

In *Castano*, the court noted that "[a] district court cannot manufacture predominance through the nimble use of subdivision (c)(4)." *Id.* at 745 n. 21. It further noted that "[t]he proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial." *Id.* at 745–746 n. 21. The court concluded by noting that the result of any other reading of rule (c)(4) "would be automatic certification in every case where there is a common issue, a result that could not have been intended." *Id.* at 746 n. 21; *accord Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 421–422 (5th Cir.1998).

Measured against this standard, which the Court finds persuasive, the Defendants' argument carries the day.[7] In this Court's view, it would defy logic and run counter to the record before this Court to find, as is required by rule 23(b)(3), "that the questions of law or fact common to the members of the class predominate over any questions affect-

---

1. In arriving at this conclusion, the Court, like Judge McCoun, expresses no opinion on the merits of the Plaintiffs' claims.

2. Objections, page 4.

3. *Id.*

4. *Id.*, pages 4 and 17.

5. Response, page 2.

6. *Id.*, page 22.

7. To the extent that Judge McCoun's views as to the correctness of the rationale of *Castano* differs from this Court's, *see* Report and Recommendation, page 671, note 21, the Court rejects it.

ing only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

Militating against a finding of predominance are the findings of Judge McCoun with regard to the issue of liability. As he correctly determined, "[w]hile Plaintiffs' theories of defectiveness and negligence are constant, the circumstances of this program were not, and the proof will likely involve distinct considerations of each shipment of Fyfanon, its storage, and the circumstance of each spraying." [8] Additionally, as Judge McCoun observed, "[t]he potential claims for damages are necessarily highly individualized as well[,]" based on considerations of the circumstances of each individual's exposure, the individual's past and current medical history, and the individual's failure to mitigate.[9] Finally, as the Defendants so cogently point out, Florida's law of comparative fault as codified in section 768.81, Florida Statutes, which by its clear terms would govern Plaintiffs' causes of action for negligence, strict liability, and products liability, poses an almost insurmountable obstacle to certification of any liability issue.[10] This Court cannot conceive of how such a determination of apportionment of fault can be dealt with on a classwide basis given the myriad of individualized factors that would affect such an apportionment under the facts of this case both as to the parties to this lawsuit and individuals and entities who are not parties to this lawsuit, including any individual or entity that may enjoy immunity,[11] a fact which was forcefully driven home by one of Defendants' counsel at the class certification hearing.[12]

Moreover, even if this Court were to accept the Plaintiffs' invitation to certify a class action limited only to the so-called common issue of whether the Defendants delivered a defective product, and even if a jury answered this question in the Plaintiffs' favor, any subsequent mini-trial involving the issue of whether the delivery of the defective product caused injury and damage to a particular Plaintiff would necessarily have to involve all of the facts and circumstances surrounding the delivery of the product if the Defendants are to receive the benefit of Florida's law governing the apportionment of fault. Thus, as the Defendants correctly observe, "the juries in the hundreds or thousands or tens of thousands of 'mini-trials' on causation and damages would be required to reconsider the findings of the original jury in the liability case in order to compare and apportion fault." [13] Accordingly, notwithstanding the initial jury's finding that the Defendants delivered a defective product, the Defendants would still have the right to make an evidentiary presentation at any mini-trial in order to acquaint the jury with all of the facts and circumstances surrounding the delivery of the defective product in an effort to convince that jury that fault should be apportioned among other individuals and entities. To conclude otherwise would be tantamount to depriving the Defendants of their guaranteed Seventh Amendment right to have a jury determine from the evidence at trial the critical issue of apportionment of fault. *See W.R. Grace & Co.—Conn. v. Dougherty,* 636 So.2d 746, 748 (Fla. 2d DCA) (concluding "that the only way to determine fault at trial is from the evidence presented to the jury"), *rev. denied,* 645 So.2d 457 (Fla.1994).

Nor is the Plaintiffs' attempt to seek class certification of the Defendants' "attendant defenses" in light of Judge McCoun's passing comments in a footnote persuasive.[14] As pointed out by the Defendants, the government emergency defense, as well as defenses related to principles of sovereign immunity, must be viewed in the context of the facts and circumstances surrounding the delivery

---

8. Report and Recommendation, page 666–67.

9. *Id.*

10. Response, pages 7–10.

11. *See Y.H. Invests., Inc. v. Godales,* 690 So.2d 1273, 1277 (Fla.1997) (holding that individual's

immunity from liability did not bar jury's consideration of her fault in causing accident).

12. Transcript, pages 125–136.

13. Response, page 10.

14. Report and Recommendation, page 671, footnote 21.

of each *individual* shipment.[15] Hence, given the highly individualized inquiry necessary to determine whether a particular shipment was or was not defective precludes a finding of predominance which is essential to class certification of these defenses.

Furthermore, the Court, based on the record before it, is in complete agreement with Judge McCoun's assessment made in the context of rule 23(b)(3)(A-D) that "[b]ecause of the potentially large number of class members and the highly individualized factual and legal issues that are implicated, a class action as proposed by the Plaintiffs would be simply unmanageable."[16] In the Court's view, the difficulties likely to be encountered in the management of a class action such as this one in which numerous plaintiffs are complaining of varying types of injuries (some of which have not matured) allegedly caused by the widespread disbursement by different individuals over a lengthy period of time and under varying conditions of multiple batches of a product allegedly rendered defective under differing factual circumstances would be insurmountable. As the Defendants have so aptly stated, "[p]laintiffs fail to explain—and cannot explain—how a threshold trial on the 14 shipments of malathion received by the State or, actually, the hundreds of spray missions undertaken by the State using malathion from those shipments, followed by hundreds or thousands of complex trials on causation, comparative fault, and damages is superior to the orderly litigation of these claims on an individual basis."[17]

Finally, as to the proposed Tropical Fish Farmers' Class, the Court finds that Judge McCoun's conclusion that "the Plaintiffs fail to demonstrate that the class is so numerous that joinder of all members is impracticable[ ]" is amply supported in the record.[18] For some unexplained reason, the Plaintiffs did not avail themselves of the opportunity authorized by Judge McCoun to establish numerosity.[19] Given that fact, they should not be heard to complain about his determination that "there is no showing of widespread harm beyond a few farms in Hillsborough County, Florida."[20] Additionally, the Plaintiffs' belated attempt to establish numerosity by attaching to their Objections an unauthenticated *draft* report of a study conducted by the Florida Tropical Fish Farmers Association relating to a problem experienced by swordtail producers during the summer of 1998 does not overcome the numerosity deficiency. As noted by the Defendants, "the document makes no reference to the medfly program, does not contain the word malathion, and does not conclude or even imply that the problems discussed in the report resulted from exposure to pesticides, much less any pesticide manufactured or sold by any of the Defendants in this case."[21]

In concluding, the Court finds it appropriate to quote from the recent case of *Rutstein v. Avis Rent–A–Car Sys., Inc.*, 211 F.3d 1228 (11th Cir.2000), because the quote captures the essence of the Plaintiffs' failed attempt to certify a class in this case. As the Eleventh Circuit Court of Appeals noted in that case, "[o]nce one understands that the issues involved in the instant case are predominantly case-specific in nature, it becomes clear that there is nothing to be gained by certifying this case as a class action; nothing, that is, except the blackmail value of a class certification that can aid the plaintiffs in coercing the defendant[s] into a settlement." *Id.* at 1240–1241 n. 21.

Accordingly, for the reasons expressed, it is ordered and adjudged as follows:

1) The Report and Recommendation of Magistrate Judge Thomas B. McCoun, III (Dkt.301), is confirmed and approved in all respects and made a part of this order for all purposes, except as may be noted otherwise in this order.

---

15. Response, pages 5–6.

16. Report and Recommendation, page 667.

17. Response, page 29.

18. Report and Recommendation, page 668.

19. *Id.*, page 668, note 18.

20. *Id.*

21. Response, page 16.

2) The Plaintiffs' Motion to Certify Class (Dkt.37), as supplemented (Dkt.187), is denied.

3) This case shall proceed on the claims of each individual Plaintiff.

4) Judge McCoun is requested to convene a status conference to consider the issues of disclosure of additional experts and their reports, the filing of motions addressed to the experts, the filing of dispositive motions, ruling on discovery motions deferred pending this Court's order on class certification, and any other matter he deems appropriate.

### REPORT AND RECOMMENDATION

MCCOUN, United States Magistrate Judge.

THIS MATTER is before the court on a referral by the Honorable Steven D. Merryday,[1] for a Report and Recommendation on **Plaintiff's Motion to Certify Class** (Doc. 37). Defendant filed a response in opposition (Doc. 73), and the parties filed supplemental pleadings following discovery on class certification issues. *See* (Docs.187, 216). Numerous declarations, affidavits, depositions, reports, and exhibits were filed in support of the pleadings. A hearing on the motion was conducted on March 29, 2001.

### I.

### A.

Plaintiffs and proposed class representatives are various individuals domiciled in the counties of Sarasota, Hillsborough, Manatee, and Seminole, Florida. Defendant Cheminova, Inc., is a New Jersey corporation and subsidiary to Defendant Cheminova A/S, a Denmark corporation. Defendant Auriga Industries A/S is a business enterprise also organized under the laws of Denmark.[2]

Certain of the facts supporting the suit are fairly undisputed. On or about May 28, 1997,

a Mediterranean fruit fly (hereinafter "medfly") was discovered in Hillsborough County, Florida. Later in 1997, additional medflies were discovered in Polk, Orange, Manatee, and Sarasota counties. The medfly is perceived as a serious threat to agriculture throughout the United States. Consequently, the United States Department of Agriculture (hereinafter "USDA") and the Florida Department of Agriculture and Consumer Services (hereinafter "FDACS") implemented a Medfly Eradication Program, which included ground and aerial application of a medfly spray in south and central Florida. In the summer of 1997, portions of Hillsborough, Polk, Orange, Manatee, and Sarasota counties were sprayed. In 1998, medflies were discovered in Dade, Lake, Marion, Manatee, and Highland counties. In the spring and summer of that year, the USDA and the FDACS again joined forces with a similar program to eradicate the medfly in these counties.

Aerial spraying was conducted by the Lee County Mosquito Control District and a private company, K & K Aircraft, Inc., under the direction of the USDA and the FDACS. Ground application was conducted by personnel of the FDACS and USDA who walked and used handheld pressure sprayers on targeted fruit trees and drenched the soil directly underneath the trees with liquid diazinon. The medfly treatment used in the aerial spraying consisted of 2.4 ounces of malathion (an organophosphate pesticide) and 9.6 ounces of corn syrup protein bait (hereinafter together "the medfly bait"). By design, the aerial spraying was intended to apply twelve (12) ounces of medfly bait per acre treated. The "Nulure" protein bait was produced by Miller Chemical & Fertilizer Corporation of Hanover, Pennsylvania. *See* Affidavit of Richard Gaskalla (Doc. 76); Affidavit of William R. Opp (Doc. 75). The ma-

---

**1.** The case has since been reassigned to the Honorable Richard A. Lazzara.

**2.** Plaintiffs allege in their Second Amended Complaint that Defendant Auriga is the parent company of Defendants Cheminova A/S and Cheminova, Inc. (Doc. 169 at ¶ 2(c)). They contend that Auriga exercises dominion and control over

the subsidiaries. To date, the undersigned has found no evidence of Auriga's involvement in the events giving rise to this suit except as the parent company. The use of the term "Defendants" herein generally refers to Cheminova A/S and Cheminova, Inc.

lathion was produced by the Defendants.[3]

Cheminova A/S manufactured malathion at its plant in Harboore, Denmark, under the trade name of Fyfanon ULV (hereinafter "Fyfanon") and shipped it to the United States in either 4,500–gallon shipping containers or 55–gallon drums. After shipment to the United States, the shipping containers were emptied into larger storage tanks or the product was kept in 55–gallon drums at one of three independent storage facilities: Micro Flo in Georgia, Ennis Agri Tech in Texas, or Gray Distribution Services, Inc., in Georgia. Thereafter, the Fyfanon was distributed by Cheminova, Inc., which similarly shipped the product in large tanker trucks or in the 55–gallon drums for further storage in Florida. The malathion was mixed with the protein bait by the FDACS, Lee County Mosquito Control, or K & K in mixing tanks here in Florida. Of the Fyfanon shipments to Florida in 1997, 19,952 gallons were stored and shipped from Micro–Flo; 15,392 gallons were stored and shipped from Ennis Agri–Tech; 2,475 gallons were stored and shipped from Gray Distribution. In 1998, Defendants supplied 7,755 gallons of Fyfanon to Florida for the Medfly Eradication Program. The Fyfanon shipped to Florida was manufactured over a period of time and came from many different batches. Except where the Fyfanon remained stored in 55–gallon drums, it was mixed with other Fyfanon product stored for various periods at these storage facilities in larger storage tanks. *See* Unsworn Declaration of Allan Van Wagner (Doc. 94); Defendants' Composite Exhibit A to Defendants' Supplemental Memorandum in Opposition to Class Certification (Doc. 217); Plaintiff's PowerPoint presentation printout (Doc. 255).

Other salient facts and allegations are disputed. Plaintiffs allege that malathion is toxic to humans and animals and corrosive to personal property. They claim the Fyfanon at issue here was defective based upon the presence of unacceptable levels of isomalathion and malaoxon, and they contend that the spraying of Fyfanon as part of the Medfly Eradication Program resulted in personal injury, damage to property, and increased risk of illness to persons residing and/or working in and around the sprayed areas. In factual support of the claim that Defendants' product was defective, Plaintiffs proffer evidence to show that the Defendants' Fyfanon product was knowingly stored, transported, and applied at temperatures in excess of the 77˝Fahrenheit maximum storage temperature recommended by the label affixed to the product containers, resulting in the build-up of unsafe levels of isomalathion or malaoxon and increased toxicity and corrosiveness of the Fyfanon product. Additionally, Plaintiffs allege that the corn syrup protein bait increased the environmental persistence of the malathion. Plaintiffs contend that at no time did Defendants advise governmental authorities of these circumstances. In contrast, Defendants claim that malathion is one of the safest of the organophosphates and one not necessarily dangerous to humans or property. They proffer testing records that suggests that at no time did they ship a dangerous or defective product. For purposes of this motion, the court accepts the Plaintiffs' allegations as true.

## B.

Plaintiffs bring this action under this court's diversity jurisdiction and allege claims for strict products liability (Count One), negligence *per se* (Count Two), negligence (Count Three), negligent infliction of emotional distress (Count Four), and toxic trespass (Count Five).[4] By the instant mo-

---

**3.** Defendants state that a very small quantity supplied from the existing stocks of the FDACS was Cythion, a malathion product previously manufactured by American Cyanamid.

**4.** The strict products liability count alleges that Defendants placed the Fyfanon product into the stream of commerce in a defective condition which rendered it unfit for its intended use. The various negligence counts allege that Defendants manufactured and distributed the Fyfanon in violation of applicable statutes, rules, or regulations of the EPA and the USDA; failed to use due care in the manufacture, distribution, transportation, and storage of the Fyfanon; placed the Fyfanon with applicators who Defendants knew to be incompetent and failed to exercise due care in supervising the agents entrusted with the storage, transportation, handling, and application of the Fyfanon; and failed to advise the FDACS, USDA, or the EPA of the defects in the Fyfanon. The emotional distress count alleges that Defen-

tion as supplemented, Plaintiffs define and seek certification of three plaintiff subclasses:

**Medical Monitoring Class:** All persons who lived or were employed in the counties of Hillsborough, Polk, Orange, Manatee, Sarasota, Dade, Lake and Highlands, State of Florida, from June 1997 through October 1998 ("the Class Period") and who were exposed to malathion-based insecticide during the Class Period.

**Personal Injury Class:** All persons who lived or were employed in the counties of Hillsborough, Polk, Orange, Manatee, Sarasota, Dade, Lake and Highlands, State of Florida, from June 1997 through October 1998 ("the Class Period") who have been clinically diagnosed with Organophosphate Poisoning attributed to malathion exposure occurring during the Class Period, or who were reported, either to health care providers or government agencies, to have suffered symptoms consistent with Organophosphate Poisoning during the Class Period, or who suffered symptoms caused or exacerbated by, or consistent with Organophosphate Poisoning during the Class Period.

**Property Damage (i.e., Tropical Fish Farm) Class:** All persons or entities who owned or operated tropical fish farms in the counties of Hillsborough, Polk, Orange, Manatee, Sarasota, Dade, Lake and Highlands, State of Florida, from June 1997 through October 1998 to which malathion product was directly or indirectly applied, causing death, deformity, or other damage to tropical aquatic life.

(Doc. 187 at 14–15).[5] Plaintiffs seek certification of the Medical Monitoring Class under Rule 23(b)(1)(A) or 23(b)(2) and seek injunctive relief in the form of a court-supervised medical monitoring program. They seek certification of the Personal Injury Class under Rule 23(b)(3) and seek to recover past and future medical expenses, past and future lost wages, damages for pain and suffering and emotional distress, and punitive damages. The Property Damage Class is also sought to be certified under Rule 23(b)(3); these class members seek compensation for property loss and economic damages resulting from the death and disfigurement of their tropical fish crops, incidental property damages, and punitive damages. Alternatively, Plaintiffs seek certification of common issues for determination on a class-wide basis under Rule 23(c)(4)(A).

For the reasons set forth below, this court concludes that certification of any subclass is inappropriate.

II.

The district court has broad discretion in determining whether to certify a class. *Heaven v. Trust Co. Bank,* 118 F.3d 735, 737 (11th Cir.1997); *Forehand v. Fla. State Hosp. at Chattahoochee,* 89 F.3d 1562, 1566 (11th Cir.1996); *Washington v. Brown & Williamson Tobacco Corp.,* 959 F.2d 1566, 1569 (11th Cir.1992). As a threshold matter, the court must ascertain whether the individual named plaintiffs have constitutional standing to raise their claims. *Murray v. Auslander,* 244 F.3d at 807, 810 (11th Cir. 2001); *Carter v. West Publ'g Co.,* 225 F.3d 1258, 1262–63 (11th Cir.2000); *Prado–Steiman ex rel. Prado v. Bush,* 221 F.3d 1266 (11th Cir.2000). It is not enough that a named plaintiff can establish a case or controversy between himself and the defendant. "Rather, each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Griffin v. Dugger,* 823 F.2d 1476, 1483 (11th Cir.1987). "[A] class representative must be part of the class and

---

dants engaged in outrageous and reckless conduct in the manufacture and distribution of the Fyfanon and should have known it would cause emotional distress. Finally, the toxic trespass count alleges Defendants knew or should have known that the defective and toxic product was unreasonably dangerous and would trespass upon Plaintiffs' person and property.

5. Plaintiff's proposed classes do not now include individuals who claim only damages to automobiles, and Plaintiffs no longer seek to include Plaintiffs who only suffered incidental damages resulting from an avoidance of exposure during the sprayings. *See* Transcript of Class Certification Hearing (Doc. 261 at 115, 119). By separate Order, the district judge has dismissed the claims of Walter Kuck and Becky Martin. *See* (Doc. 300).

'possess the same interest and suffer the same injury' as the class members." *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (quoting *East Texas Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977)).[6]

Rule 23(a) of the Federal Rules of Civil Procedure sets forth the requirements for class certification, commonly referred to as (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.[7] *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Falcon,* 457 U.S. at 156, 102 S.Ct. 2364; *Jones v. Firestone Tire and Rubber Co.,* 977 F.2d 527, 534 (11th Cir.1992). The burden of proving these prerequisites is on the representative parties seeking class certification. *Rutstein v. Avis Rent–A–Car Sys., Inc.,* 211 F.3d 1228, 1233 (11th Cir.2000); *Heaven,* 118 F.3d at 737.

■ Rule 23(a)(1) provides that a class action may be maintained only if the class is so numerous that joinder of all class members is impracticable. There is no yardstick that measures the minimum class members necessary to satisfy the requirements of numerosity. *Armstead v. Pingree,* 629 F.Supp. 273, 279 (M.D.Fla.1986) (citing *Jones v. Diamond,* 519 F.2d 1090, 1099 (5th Cir.1975)). Numerosity depends on the circumstances of each case. Factors to be considered by the court include the proposed class size, ease of identifying members' names and addresses, ease with which they could be served, and their geographic location. *Kilgo v. Bowman Transp., Inc.,* 789 F.2d 859, 878 (11th Cir. 1986); *Garcia v. Gloor,* 618 F.2d 264, 267 (5th Cir.1980). It is not necessary that a precise number of class members be known; Plaintiffs may make reasonable and supported estimates as to the size of the proposed class. *Fuller v. Becker & Poliakoff, P.A.,* 197 F.R.D. 697, 699 (M.D.Fla.2000).

■ Next, the Plaintiffs must meet the commonality requirement by identifying specifically questions of law and fact common to the named Plaintiffs and putative class members. Class relief is appropriate when the "issues involved are common to the class as a whole" and when they "turn on questions of law applicable in the same manner to each member of the class." *Falcon,* 457 U.S. at 155, 102 S.Ct. 2364 (quoting *Califano v. Yamasaki,* 442 U.S. 682, 701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). Although the court should not, at the class certification stage, determine whether the plaintiff has stated a cause of action or will prevail on the merits, "evidence relevant to the commonality requirement is often intertwined with the merits." *Hudson,* 90 F.3d at 457 (quoting *Nelson v. U.S. Steel Corp.,* 709 F.2d 675, 679 (11th Cir.1983)).

■ The third element of Rule 23(a) requires the Plaintiffs to establish that their claims are typical of the claims of the class members as a whole. Plaintiffs may satisfy the typicality requirement upon showing that there is a "strong similarity of legal theories," despite substantial factual variations. *Murray,* 244 F.3d at 811 (quoting *Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir. 1985)); *see also Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir. 1984) (typicality may be demonstrated where Plaintiffs' claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of the class). "Traditionally, commonality refers to the group characteristics of the class as a whole and typicality refers to the individual characteristics of the named plaintiff in relation to

---

6. The Defendants make no argument contesting the standing of remaining named Plaintiffs to represent the proposed subclasses, specifically, that James Hatfield has standing to represent the claims of a tropical fish farmer class, and that the other named Plaintiffs have standing to represent the claims of medical monitoring or personal injury classes. Thus, the court finds it unnecessary to discuss the standing requirement with respect to each of the proposed subclasses.

7. Rule 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

the class." *Prado–Steiman*, 221 F.3d at 1279. Although commonality and typicality constitute two distinct limitations on class certification under Rule 23, they tend to merge in practice. *Falcon*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364.

■ Finally, named Plaintiffs must establish the adequacy of themselves and of counsel to represent the putative class. "The adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and of whether plaintiffs have interests antagonistic to the rest of the class." *Griffin v. Carlin*, 755 F.2d 1516, 1532–33 (11th Cir.1985), *quoted in Shores v. Sklar*, 844 F.2d 1485, 1495 (11th Cir.1988); *Johnson v. Ga. Highway Express, Inc.*, 417 F.2d 1122, 1125 (5th Cir. 1969). The adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem*, 521 U.S. at 625–626, 117 S.Ct. 2231 (citing *Falcon*, 457 U.S. at 157–158 n. 13, 102 S.Ct. 2364, and quoting *East Tex. Motor Freight*, 431 U.S. at 403, 97 S.Ct. 1891).

If the Plaintiffs establish each of these four factors, they must then satisfy at least one of the alternative requirements of Rule 23(b). *Amchem Prods.*, 521 U.S. at 614, 117 S.Ct. 2231; *Griffin*, 823 F.2d at 1482; *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir.1997).

### III.

Before addressing each proposed subclass and the requirements of Rule 23, it is perhaps useful to summarize each party's central theme for or against class certification. Plaintiffs' argument in support of class certification is founded upon the contention that their proof of Defendants' negligence and distribution of a defective and hazardous product so clearly presents the common and predominant factual and legal issues of the litigation, that certification is the only reasonable and efficient way for this court to address the hundreds or perhaps thousands of claims that exist as a result of the eradi-cation program. According to the Plaintiffs, whether this case is tried in multiple separate lawsuits or as a class action, in every case they will be called upon to prove that the Defendants were aware that the heating of Fyfanon to temperatures exceeding 25°C (77°F) could result in increased levels of iso-malathion, a malathion impurity of increased toxicity, thus making the product hazardous for use around humans or property; that despite this knowledge Defendants shipped, stored and handled the Fyfanon used in this eradication program in a negligent and dangerous manner contrary to their own label warnings, marketing literature, internal company documents, and testimony of company representatives at temperatures greater than 25°C. While Plaintiffs acknowledge that their claims may involve some individualized issues related to causation or damages, they suggest that such issues do not override the common issues for each subclass and thus class certification for each subgroup is appropriate.

Defendants' central theme in opposition to class certification of any subclass is that individualized issues of proximate causation, comparative fault, and damages defeat any commonality of fact and law and clearly predominate over class-wide issues. Indeed, Defendants deny that there are truly common issues, given the varied circumstances during this particular eradication program. Thus, Defendants urge that because the undisputed evidence establishes the malathion used in the program came from various batches of manufacture in Denmark and was thereafter shipped at different times and under different circumstances, and stored in different circumstances at different facilities, before shipment to Florida at various times and under differing circumstances, there to be stored until mixing and use at different locations and times during the summers of 1997 and 1998 there can be no finding of commonality. Furthermore, Defendants urge across the board that no subclass should be certified because Plaintiffs' tort theory is immature both in the law and in science. Stated otherwise, no such claims for damages caused by aerial spraying of malathion have ever been tried before, and the state of the

law as well as the medicine/science related to such claims is not adequately developed so as to appropriately allow for a class action in resolution of the claims.

## A.

### *The Medical Monitoring Subclass*

Plaintiffs first seek certification of a subclass of individuals who were exposed to malathion-based insecticide during the Medfly Eradication Program from June 1997 through October 1998. This proposed subclass includes individuals such as named Plaintiffs (excluding Mr. Hatfield), who claim. to have suffered symptoms or reactions attributable to or consistent with organophosphate poisoning, as well as individuals who have been asymptomatic despite exposure. The cause of action for medical monitoring allows for recovery of the costs of periodic medical examinations necessary to detect the onset of physical harms even in the absence of physical injury. *See Barnes v. Am. Tobacco Co.,* 161 F.3d 127 (3rd Cir.1998). Thus, this subclass seeks the establishment of a medical monitoring program through which putative class members could receive long-term, periodic monitoring for latent serious disease resulting from malathion exposure. As proposed by the Plaintiffs, such a program would be funded by the Defendants and supervised by the court.

### 1.

Plaintiffs argue that each proposed subclass is so numerous that joinder of all members is impracticable. While Plaintiffs do not give a specific number of members in the medical monitoring subclass, they urge that since several million people lived in the affected areas, several hundreds of persons complained about the spraying, local doctors reported a notable increase in symptoms consistent with pesticide exposure, and numerous applicators complained of symptoms consistent with pesticide poisoning, common sense dictates that the putative class size is at least in the hundreds and likely in the thousands. Defendants do not dispute that the proposed medical monitoring subclass is sufficiently numerous; indeed, they accuse the Plaintiffs of attempting to establish what

would be the largest HMO in the State with potentially tens of thousands of members, if not more. However, they argue that Plaintiffs have failed to define the class with sufficient precision to identify its members. More specifically, Defendants argue that the terms, "exposed" and "malathion-based insecticide," as used in the class definition are too broad and vague to establish the parameters of the proposed medical monitoring class.

In this regard, Rule 23(a) also contains an implicit requirement that the class be "adequately defined and clearly ascertainable." *DeBremaecker v. Short,* 433 F.2d 733, 734 (5th Cir.1970), *cited in Neumont v. Monroe County, Fla.,* 198 F.R.D. 554, 556 (S.D.Fla.2000); *see also In re Disposable Contact Lens Antitrust Litig.,* 170 F.R.D. 524 (M.D.Fla.1996). While the precise numbers of proposed class members need not be established, *see Sandlin v. Shapiro & Fishman,* 168 F.R.D. 662, 666 (M.D.Fla.1996), the class description must be sufficiently definite for the court to ascertain member status. *Neumont,* 198 F.R.D. at 558 (citing *O'Connor v. Boeing N. Am., Inc.,* 184 F.R.D. 311, 319 (C.D.Cal.1998)).

As to this medical monitoring subclass, I find that Plaintiffs have established numerosity but have failed to define the proposed subclass with sufficient precision or specificity to allow for determination of its members. The use of the term "exposed" in connection with the definition of such a subclass is not necessarily offensive given the nature of the alleged underlying tort. However, absent further limiting language, it is conceivable that every citizen present in the geographic area during the spraying period might claim to be a part of the class having been "exposed" to the spraying in one fashion or another. To illustrate this, the named Plaintiffs claim exposure in a variety of ways. For example, Kathryn Rink claims to have been sprayed on her leg and clothing during ground spraying and that her sons were exposed by climbing trees and playing in the yard, which she describes as saturated during the ground spraying; she also claims that they were exposed through inhalation and skin absorption of spray drifts. *See* Deposi-

tion of Kathryn Rink (Doc. 90 at 112–14, 124–26, 129–30, 136–37). Other Plaintiffs claim exposure by direct contact with their skin and clothing during aerial sprayings, but they provide vastly different accounts of exposure with respect to the time, location, type, numbers of occurrences, and dose. *See* Depositions of Michael Anolfo (Doc. 78); Diane Culkin (Doc. 80); Angelina Des Autelles [sic] (Doc. 81); Kathryn Hayes [sic] (Doc. 85); Mark Knierim (Doc. 86). The Gavonis claim that they were exposed to malathion through inhalation during aerial spraying over their condominium at night when their windows were open, *see* Deposition of Gino Gavoni, Sr. (Doc. 82 at 72–73); Deposition of Lisa Gavoni (Doc. 83 at 44–45), or through indirect exposure from malathion contamination of their porch, the park, and their house under construction during the program. *See id.* at 62–68, 74–76. While it may be argued that these allegations help illustrate if not define the intended class, the court is not assured that this is so.

As a practical matter, this definition can be read to include every breathing soul physically present in the geographic area of the aerial spraying at or near the time of the spraying. Such a vague class definition portends significant manageability problems for the court. These manageability problems are compounded by the fact, as discussed below, the Plaintiffs are unable to articulate clearly the physical harms to be monitored through such a program. Thus, not only is there uncertainty as to who would properly be in this class but also what purpose the class would serve.

Additionally, the court agrees that the phrase "malathion-based insecticide" is at least overbroad. Though it may be inferred that the Plaintiffs are referring solely to Defendants' Fyfanon product, Defendants contend that there was one other malathion product used early in the spraying, and greater clarity is required here as well. Additionally, the proffered evidence indicates that malathion is used in the control of mosquitos as well. Read literally, the class definition would include exposure to such pesticide used to eradicate mosquitos during the class period as well.

While this court does not believe that such an overly broad class is intended by the Plaintiffs, as defined, this class is ill-defined, not manageable, and should not be certified for this reason alone.

2.

■ Assuming *arguendo* that Plaintiffs can meet the numerosity and definiteness requirements of Rule 23(a), they must next establish that issues of law and fact exist which are common to the named Plaintiffs and the putative medical monitoring class members. In this regard, the Plaintiffs broadly assert that ". . . where plaintiffs seek joint relief, such as medical monitoring, the commonality requirement 'usually' exists by its very nature." *See* (Doc. 187 at 24) (citing *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 649 (C.D.Cal.1996)). Plaintiffs also rely on case law holding that not all issues raised in a suit need be common so long as at least one issue is common to all class members. *See Hively v. Northlake Foods, Inc.*, 191 F.R.D. 661, 668 (M.D.Fla.2000); *Haley*, 169 F.R.D. at 648.

In contrast, Defendants urge that while the Plaintiffs claim a common theme, the varied circumstances of the handling of this product, the varied nature of the named Plaintiffs' and the putative class members' exposure to the product, and the varied claims of harm asserted by each or to be asserted by each result in a case where the common issues are so altered or varied by the individual circumstances of each class member that commonality is destroyed. Stated another way, the Defendants urge that individualized issues inherent in the proposed medical monitoring claim are so varied and inextricably intertwined with the common issues that class certification is not appropriate. *See* (Doc. 216 at 69) (citing *Newton v. Southern Wood Piedmont Co.*, 163 F.R.D. 625, 632–33 (S.D.Ga.1995); *In re Temple*, 851 F.2d 1269 (11th Cir.1988); *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451 (11th Cir.1996); *Reilly v. Gould, Inc.*, 965 F.Supp. 588, 597–98 (M.D.Pa.1997); *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258 (S.D.Cal.1988); *Harding v. Tambrands, Inc.*, 165 F.R.D. 623 (D.Kan.1996)).

As case law recognizes, evidence pertinent to the commonality requirement is often intertwined with the merits. Such is the case here and accordingly, the court will look to the specific elements of a medical monitoring claim in deciding this issue.[8] In this regard, Plaintiffs' best claim of commonality of facts surrounds the elements of *exposure to a proven hazardous substance caused by the Defendants negligence.*[9] As indicated above, the common proof of the existence of a defective and hazardous product and the Defendants' negligence are urged by the Plaintiffs to be the predominant issues in this case. This court has carefully considered this contention and agrees with it to the extent that were Plaintiffs called upon to proceed by way of multiple separate trials, they would assert in each case a common theory of negligence and claim of liability for the allegedly defective and hazardous product. Defendants would likewise assert the same or similar factual and legal defenses in opposition. In this broad sense, these elements to the medical monitoring claim present common issues

of fact. However, as discussed below, when the matter is considered closely, even these elements would involve individualistic proof considerations that are borne of the varied circumstances inherent in this eradication program.

As for the remaining elements of the medical monitoring claim, individualized considerations would so permeate the proof and thus work to alter and diminish the common questions that no finding of commonality is warranted. For example, whether class members were *exposed to greater than normal background levels* of Fyfanon is, by its very nature, a wholly individualized inquiry that undermines the common issues and cannot be examined on a class-wide basis. Moreover, the element of *whether a putative class member has a significantly increased risk of contracting a serious latent disease* from this product is not at all a common issue of fact in this litigation and would necessarily depend upon the varied circumstances of the class members' exposure and other factors which may increase risk of disease.[10] *See* Report of

**8.** In *Petito v. A.H. Robins Co.*, 750 So.2d 103 (Fla.Dist.Ct.App.1999), the District Court of Appeal of Florida for the Third District recognized a cause of action for future expenses of medical diagnosis. *See id.* at 104, 108. The court held that

a trial court may use its equitable powers to create and supervise a fund for medical monitoring purposes if the plaintiff establishes the following elements: (1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

*Id.* at 106–07 (quoting *Barnes*, 161 F.3d at 138–39 (applying Pennsylvania law)).

**9.** Plaintiffs also urge common legal issues arising from several of the affirmative defenses asserted by the Defendants. To be sure, many of the defenses raised by the Defendants are common to all class members, and the single determination of these defenses would likely be beneficial and more efficient.

**10.** Whether there is a recognized increased risk of contracting *any* serious latent disease is itself

a debatable point which further undermines the relief sought in this case. Most of the identified symptoms of malathion exposure would not be classified as suggesting serious latent disease. *See* (Doc. 216 at 22–23) (citing to the Deposition of Dr. Lappé at 138–145 and Deposition of Dr. Meggs at 49–57). While it is undisputed that isomalathion is recognized to pose some health risks, Plaintiffs present no clear evidence that malathion/isomalathion exposure is a potentiator for significantly increased risk of an identified serious latent disease. For example, while they urge that malathion is a carcinogen (for which cancer monitoring might be appropriate), at most they show that the Defendants have conducted cancer research studies and that the EPA once classified malathion as a "likely human carcinogen" and then reclassified it as "suggestive" of human carcinogenicity. *See* (Doc. 255). Plaintiffs also suggest that the exposure causes "neurological conditions which result in long-term psychological issues," (Doc. 261 at 75), but any suggestion that latent neurologic disease is presently associated with malathion exposure is not well-developed in science or medicine, either. Similarly, Plaintiffs make a passing suggestion that monitoring for respiratory disorders is also in order; however, they present no evidence that exposure causes a significantly increased risk of contracting a serious latent respiratory illness. Plaintiffs' strongest argument appears to come from Dr. Lappé who suggests a "preliminary roster of potential targets for monitoring" listing nine categories of

Dr. Raymond D. Harbison (Doc. 220, Exh. 1 at 3–7); Affidavit of Ronald Gots, M.D., Ph.D. (Doc. 77 at 5–8); Report of Ronald Gots, M.D., Ph.D. (Doc. 220, Exh. 2 at 15–17); Deposition of Dr. Lappé (Doc. 232 at 152–53).

Given that there are no clearly identified latent diseases associated with malathion/isomalathion exposure of the type at issue here, the remaining elements of such a claim, dealing with the actual procedures of monitoring, cannot be said to involve common issues as opposed to individualized considerations. Indeed, Plaintiffs appear unable to propose a specific type of monitoring program but instead suggest that upon a jury determination that medical monitoring is appropriate, the court with the assistance of doctors could fashion and administer an appropriate program. *See* Transcript of Class Certification Hearing (Doc. 261 at 74, 118). Such a vague suggestion is insufficient to establish the remaining elements that *a viable monitoring procedure exists to detect disease,* if any, resulting from malathion exposure, that any *such monitoring would deviate from normal health monitoring in the absence of exposure,* or that any *such monitoring regime is reasonably necessary according to contemporary scientific principles.*

Even in a light favorable to the Plaintiffs, so varied are the facts surrounding each individual's exposure, so varied are the individual reactions of persons exposed to malathion in this fashion, and so uncertain are the long term health consequences of this type exposure, only something in the nature of a general clinic (in the nature of the Defendants' feared HMO) would suffice to meet all the individualized assessment needs of the putative class members. Such a program would in actuality be more akin to a study than to a monitoring program, and this appears entirely unsupported in the law as a separate cause of action. In any event, while Plaintiffs may claim certain common issues of fact, the individualized considerations of this claim work to defeat a finding of commonality sufficient to support class certification.[11] *See Barnes,* 161 F.3d at 145–46 (finding that individualized issues of causation, addiction, the affirmative defenses of comparative and contributory negligence and the need for medical monitoring presented too many individual issues to permit class certification and medical monitoring relief); *see also Guillory v. Am. Tobacco Co.,* No. 97 C. 8641, 2001 WL 290603, at *6 (N.D.Ill. Mar.20, 2001); *Reilly,* 965 F.Supp. at 598 (although all plaintiffs were exposed to lead emission, finding no commonality because whether and to what extent emissions affected each class member is not common, and any common claims changed by individual facts and situation of each plaintiff).

3.

As for the remaining requirements of typicality and adequacy of representation,[12] given the nature of the remedy sought and the circumstances of this case, it is unlikely that the named Plaintiffs satisfy these requirements for the proposed subclass as a

non-cancer illnesses "reasonably to be expected to be at increased risk in isomalathion/malathion exposed community...." (Doc. 187, Exh. 3). A fair reading of this expert's report and all other expert reports however, suggests that medical and scientific research in this area is still developing. At best, Plaintiffs can show only that there is active debate and ongoing study in the scientific and medical community over whether isomalathion/malathion is a source of human disease and they concede that the risk of any latent disease as a result of malathion exposure is the subject of "ongoing debate." *See* Transcript of Class Certification Hearing (Doc. 261 at 56, 73–74); *see also* (Doc. 187 at 11–12) (citing Deposition of Cheminova, Inc., by Don O'Shaughnessy (Doc. 191 at 329)); Deposition of William J. Meggs, M.D., Ph.D. (Doc. 233); Report of Ronald E. Gots, M.D., Ph.D. (Doc. 220, Exh. 2 at 19); Affidavit of Dr. Gots, M.D., Ph.D. (Doc. 77 at 10); Report of Dr. Raymond D. Harbison (Doc. 220, Exh. 1).

11. This conclusion is only bolstered by consideration of the several affirmative defenses raised by the Defendants and applicable to this claim. In addition to denying causation, Defendants assert a comparative fault defense, a preexisting condition defense and a failure to mitigate defense. *See* (Doc. 182). Such defenses would necessarily require highly individualized considerations.

12. The requirements of typicality and adequacy of representation are alike in that they evaluate the sufficiency of the named plaintiffs and look for the potential for conflicts in the class. *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610 (3rd Cir.1996), *aff'd sub. nom. Amchem Prods., Inc., v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

whole. First, while this court recognizes that the requirement of typicality is not necessarily a difficult one to establish, and in a general sense, the named Plaintiffs can claim that their desire for medical monitoring for increased risk of latent disease is no different than that desired by putative class members, the proposed medical monitoring subclass is so ill-defined in terms of its members and its scope that it is practically impossible to conclude with any assurance that any or all of the named Plaintiffs have a claim typical of the whole of the proposed class. Second, a plausible argument exists that the claims of the named Plaintiffs may not align with all those in the class, and thus a conflict may exist which precludes a finding of adequacy of representation.

Each of the named Plaintiffs claim to have present personal injuries and an increased risk of contracting a latent disease from their exposure to Fyfanon. The proposed class includes others similarly situated but also an unknown number of persons with no present injury who propose to be a part of the subclass because of their purported increased risk of contracting a latent disease as well. The named Plaintiffs may properly claim typicality and adequacy as to those similarly situated persons who also claim present injury and seek monitoring for future harms. However, my concern here is for the remainder of the putative class of Plaintiffs who have no present injuries and who do not here seek immediate relief. Can the named Plaintiffs claim typicality and adequacy of their representation of these persons? As noted above, the proof necessary to place even the named Plaintiffs within this subgroup for medical monitoring is fraught with individual issues, and as the expert reports reveal, the science behind the purported need or availability for monitoring is debatable at best even as it relates to those evidencing a present reaction to exposure. Typicality is not clearly established in these circumstances.

Here, the Defendants' contention that Plaintiffs seek to prosecute an "immature tort" is most plausible. The theory that isomalathion/malathion exposure enhances the risk of contracting a serious latent disease is even less tested in the courts than in the laboratory. While the evidence suggests that this pesticide has been used for many years, there is no history of litigation to help set the course of the proceedings. In this sense, the claim is novel. In these circumstances, I find it ill-advised to speculate that there is a similarity of legal theories and lack of antagonism between the named Plaintiffs and those putative class members who have evidenced no injury to date. How the not-yet-injured class members would prosecute their claims is almost entirely conjectural. While one can reasonably anticipate the named Plaintiffs' proof at trial progressing from their proof of injury to the need for monitoring against other possible harms, to say that the not-yet-injured plaintiffs would employ the same or consistent theories is speculation at best. In my view, it follows that the individualized nature of the proof and the novelty of the claim militate against finding typicality. Because the named Plaintiffs may not be the appropriate representatives of the not-yet-injured class members, no finding of typicality is appropriate.

■ As described above, the named Plaintiffs also seek to represent a separate subclass asserting claims for their personal injury. The relief sought by the personal injury subclass includes monetary damages for past and future injuries. Defendants urge that such circumstances place the named Plaintiffs into a position which is or may be antagonistic to that of the absentee class members who evidence no present injuries.

A similar argument was employed successfully in *Georgine v. Amchem Prods., Inc.*, to defeat a proposed settlement class action. There, the Third Circuit found an unacceptable conflict to exist between named plaintiffs who had suffered present injuries and who sought immediate monetary relief and future not-yet-injured plaintiffs who were proposed to be included in the settlement class. In light of such conflict, the court rejected findings of typicality and adequacy of representation. *Georgine*, 83 F.3d at 630–32.

Here, Plaintiffs urge that the factual circumstances differ as there is no such antagonism because both those with and without present injuries have a common concern

about the long-term health implications of exposure. While this may be true and the cases do differ, the court cannot ignore that the named Plaintiffs complain of extremely varied types and degrees of illness or injury as a result of exposure, and that they seek immediate compensation for past and future damages including medical expenses by way of this separate subclass. As such, their interests and motivations in the personal injury subclass are not necessarily aligned with the interests of the not-yet-injured members of the medical monitoring subclass who, at present, seek only a fund to cover costs related to their monitoring. It is not unreasonable to anticipate that because of the differences, named Plaintiffs may not seek to adequately protect the not-yet-injured members of the monitoring subclass should it develop that it is not in their interest to do so. Because of the potential for such conflict, I conclude that the requirement of adequacy of representation is not met by these named Plaintiffs.[13]

In conclusion, the requirements of Rule 23(a) are not met when they are carefully scrutinized. I find that no medical monitoring subclass should be certified. As proposed, it is simply too ill-defined to be manageable and too fraught with individualized considerations as well as speculation to be justified.

### 4.

As for the Rule 23(b) considerations, here Plaintiffs seek certification under Rule 23(b)(1)(A) or (b)(2). Class certification under Rule 23(b)(1)(A) is appropriate where the requirements of Rule 23(a) are satisfied and "the prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." Fed.R.Civ.P. 23(b)(1)(A). Certification under Rule 23(b)(1)(A) is appropriate "where different results in separate actions would impair the opposing party's ability to pursue a uniform

continuing course of conduct." *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 284 (S.D.Ohio 1997) (quoting Charles A. Wright, et al., 7A Federal Practice & Procedure, § 1773 at 431 (2d ed.1986)). In other words, the rule is intended to protect the defendant from being sued for "different and incompatible affirmative relief." *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 99 (W.D.Mo.1997). Under subsection 23(b)(2), class certification is appropriate where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief . . . with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2).

Here, if the district judge should reach a contrary conclusion on the Rule 23(a) requirements for this subclass, then the medical monitoring subclass *could* be certified under Rule 23(b)(1)(A) or 23(b)(2). In cases cited by Plaintiffs, other courts have found that medical monitoring claims are appropriate for certification pursuant to Rule 23(b)(1)(A) because separate adjudications would impair Defendants' ability to pursue a single, uniform monitoring program. *See In re Telectronics Pacing Sys.*, 172 F.R.D. at 284 (citing *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 67 (S.D.Ohio 1991)). Thus, this court could conclude that a medical monitoring class action would avoid inconsistent and varying adjudications likely to occur if multiple separate trials were ordered on the need for medical monitoring and would offer to the Defendants the benefit of a single court-ordered monitoring program for the class if appropriate.

Alternatively, the subclass *can* be certified under Rule 23(b)(2), where the Defendants have acted in a manner generally applicable to the subclass, and medical monitoring relief sought is injunctive in nature rather than essentially a claim for damages. *See Yslava v. Hughes Aircraft Co.*, 845 F.Supp. 705, 713 (D.Ariz.1993); *Day v. NLO, Inc.*, 144 F.R.D. 330 (S.D.Ohio 1992). Defendants urge that Plaintiffs' claim for medical monitoring is essentially a suit for damages and thus inap-

---

**13.** Insofar as the adequacy inquiry also involves consideration of counsels' competence and adequacy to prosecute the claim, the court is confi-
dent that Plaintiff's counsel possess the necessary skill and financial wherewithal to represent any of the proposed subclasses adequately.

propriate for certification under 23(b)(2). *See Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473 (D.Colo.1998) (citing *Boughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir.1995); *Bldg. & Constr. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1492 (10th Cir.1993)). While the Plaintiffs do seek damages as relief for the personal injury subclass, such relief is distinct and separate from the injunctive relief sought by the medical monitoring subclass.

On the other hand, for reason expressed above, the district judge *could* reach a contrary conclusion that the class relief in question is so fraught with individualized issues that dictate the member's entitlement to and the need of monitoring that no Rule 23(b)(1) or (b)(2) certification is appropriate. Such was the conclusion by the Third Circuit in *Barnes* which affirmed a decision decertifying a medical monitoring class under Rule 23(b)(2) upon the conclusion that too many individual issues existed to allow for a 23(b)(2) class. *Barnes*, 161 F.3d at 143.

Similarly, in *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90 (W.D.Mo. 1997), the court denied certification of a personal injury class in which a claim for medical monitoring was also asserted. In *Smith*, plaintiffs sought certification of a Rule 23(b)(1)(A) and 23(b)(2) class of smokers who claimed injuries allegedly resulting from smoking cigarettes manufactured by the defendant tobacco company. In declining to certify any class, the court recognized that merely because individual lawsuits might end with different results was no reason to certify a class where

> [v]arying results may occur because of various individual issues that will dictate a particular class members' entitlement to, and the nature of, medical monitoring. When the relief in question is fraught with individualized issues, resort to Rule 23(b)(1) is inappropriate.

*Id.* at 99. The court also declined to certify a Rule 23(b)(2) class, finding that the claim for a medical monitoring fund along with other demands for damages indicated that the claim was predominately about monetary relief rather than injunctive relief.

In conclusion, if the district judge reaches a contrary conclusion on the Rule 23(a) re-

quirements, a Rule 23(b)(1)(A) or a 23(b)(2) class is possible. However, the decision in *Barnes* would nevertheless appear to present a compelling rationale for not certifying the medical monitoring subclass under 23(b)(2) because of the individualized nature of the proof. If appropriate at all, the more appropriate class would appear to be under Rule 23(b)(1)(A).

## B.

### *The Personal Injury Subclass*

Plaintiffs next seek certification of a subclass of individuals who claim injuries as a result of "organophosphate poisoning" during the "class period" from June 1997 through October 1998. The named Plaintiffs claim that they were exposed to malathion through different methods of application, at various times and locations, and in various doses and incidents of exposure. They allege a variety of ailments, including nausea, vomiting, dizziness, headaches, fatigue, respiratory problems, chest pains, pregnancy complications, birth defects, seizures, and skin problems. As relief, this subclass seeks past and future medical expenses, past and future lost wages, damages for pain and suffering and emotional distress, and punitive damages.

### 1.

Plaintiffs can offer no specific number of members in this proposed class, but again urge that common sense dictates that in the circumstances of this case, this subgroup will number at least in the hundreds, if not thousands. The court is satisfied that the members of this class are likely so numerous as to make joinder of all such members impracticable under 23(a)(1). However, Plaintiffs' definition of a Personal Injury Class suffers from defects similar to that of the medical monitoring class definition. Plaintiffs seek to include in this class individuals *"who have been clinically diagnosed with ... or who were reported ... to have suffered symptoms consistent with ... or who suffered symptoms caused or exacerbated by, or consistent with Organophosphate Poisoning"* during the class period. (Doc. 187 at 15) (emphasis added). Again, while it may be assumed that Plaintiffs refer to orga-

nophosphate poisoning resulting from exposure to Defendant's product used as part of the Medfly Eradication Program in the specified counties during the specified time frame, this is not at all clear. By this definition, the "organophosphate poisoning" complained of is not necessarily tied to exposure from the activities of the eradication program, nor it is necessarily tied to exposure to Fyfanon as opposed to some other organophosphate. For example, diazinon, another organophosphate, was also used in the eradication program for ground applications. Defendants are not associated with this product in any way. Yet, persons claiming exposure and harm from the use of diazinon are arguably included in this class as are others who claim exposure to some other organophosphate. Furthermore, members of this subclass need only have suffered symptoms, or reported to have suffered symptoms "consistent" with organophosphate poisoning during the class period, regardless of whether the symptoms are attributable to Defendants' activities. As defined by Plaintiffs, the personal injury class is too broad and vague, especially for a Rule 23(b)(3) class. While this defect likely can be cured by amending the class definition, as the subclass is presently defined, the court cannot ascertain the appropriate number or appropriate scope of the class, and it should not be certified.

### 2.

Even if Plaintiffs can establish numerosity and an ascertainable class, Plaintiffs fail to demonstrate commonality and predominance under Rule 23(a)(2) and 23(b)(3).[14] For certification under Rule 23(b)(3), Plaintiffs must meet two requirements beyond the Rule 23(a) requirements: questions common to the class must predominate over questions affecting individual members, and class resolution must be superior to other methods of adjudication. Fed.R.Civ.P. 23(b)(3); *Amchem*, 521 U.S. at 615, 623–24,

117 S.Ct. 2231. With respect to the predominance requirement, "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Rutstein*, 211 F.3d at 1233 (quoting *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1548 (11th Cir.1989)). This inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623, 117 S.Ct. 2231 (citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane 518–519). Although mass tort cases may present common questions of liability and defenses to liability, the court should be cautious about certifying a class "when individual stakes are high and disparities among class members are great." *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231; *see also Georgine*, 83 F.3d at 627–28.

As observed previously herein, Plaintiffs urge that common factual and legal questions concerning improper storage and handling and the toxicity of Defendants' product predominate over individualized issues of causation and damages. Unlike a mass tort arising from an isolated occurrence or accident, however, this case involves the aerial spraying of malathion at different times and geographic areas and under differing circumstances during 1997 and then again in 1998. While Plaintiffs' theories of defectiveness and negligence are constant, the circumstances of this program were not, and the proof will likely involve distinct considerations of each shipment of Fyfanon, its storage, and the circumstances of each spraying. Beyond this, the claims of putative class members are highly disparate. Individual Plaintiffs will claim exposure of different types, varied doses, and by differing numbers of claimed occurrences. Additionally, putative class members may claim a broad range of highly diverse reactions,[15] and the nature and ex-

---

**14.** As urged by the Plaintiffs' counsel, the court will discuss predominance under Rule 23(b)(3) in conjunction with commonality under Rule 23(a)(2), since the predominance standard is more stringent and subsumes or supercedes the commonality requirement. *See Amchem*, 521 U.S. at 609, 117 S.Ct. 2231; *see also* Transcript

of Class Certification Hearing (Doc. 261 at 49–50).

**15.** An extensive list of potential adverse reactions listed by Dr. Meggs and Dr. Lappé are compiled by Defendants in their memorandum. *See* (Doc. 216 at 23); *see also* Report of Marc Lappé, Ph.D. (Doc. 187, Exh. 3 at 9); Declaration of William J.

tent of the harm suffered depends in part upon the various individual circumstances of the person exposed, including their current health and past medical history. The potential claims for damages are necessarily highly individualized as well. All of this says nothing of the defenses of comparative fault, pre-existing conditions, and failure to mitigate on the part of the Plaintiffs. Defendants' inquiry here is also highly individualized.

Factual distinctions in plaintiffs' claims do not necessarily defeat commonality or typicality. *Prado–Steiman*, 221 F.3d at 1279; *Appleyard*, 754 F.2d at 958. However, in this instance,

> [t]hese factual differences translate into significant legal differences. Differences in the amount of exposure and nexus between exposure and injury lead to disparate applications of legal rules, including matters of causation, comparative fault, and the types of damages available to each plaintiff.

*Georgine*, 83 F.3d at 626, *quoted in Castano*, 84 F.3d at 742 n. 15. In light of the highly individualized factual and legal questions implicated by Plaintiffs' claims, the court finds that Plaintiffs have failed to satisfy the predominance requirement of Rule 23(b)(3).

▇▇▇ Rule 23(b)(3) also requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). In making this determination, the court must consider the following matters, among others:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the

controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Id.* Some of the factors may weigh in favor of the Plaintiffs. For example, the members of the class would appear to have an interest in prosecuting their claims as a class rather than through separate actions, given the high cost of prosecuting such claims and the potential for relatively low returns on the investment in any given case. However, the fourth factor weighs overwhelmingly against finding that a class action is superior to other methods of adjudication. Because of the potentially large number of class members and the highly individualized factual and legal issues that are implicated, a class action as proposed by the Plaintiffs would be simply unmanageable.[16]

### C.

#### *The Property Damage (i.e., Tropical Fish Farm) Subclass*

The Plaintiffs seek certification of a class consisting of several dozen to perhaps more than 100 owners and/operators of tropical fish farms who seek damages for property and economic loss. Plaintiff, Mr. Jay Hatfield, is a producer of ornamental fish at a farm in Hillsborough County, Florida. He purports to represent a group of fellow producers whose fish were killed or developed deformities, such as scoliosis, or were otherwise damaged after their fish ponds were sprayed during the eradication program.

---

Meggs, M.D., Ph.D. (Doc. 189, Exh. 3, at ¶¶ 7, 10); Declaration of Leonard Y. Cosmo, M.D. (Doc. 189, Exh. 5, at ¶ 9); Deposition of Philip Adler, M.D. (Doc. 198 at 7, 11, 15–16); Deposition of Dr. Carol Roberts (Doc. 199 at 16); Memorandum from Jerome Blondell, Ph.D., and Monica F. Spann, M.P.H. to Paula Deschamp (Aug. 18, 1998) (Doc. 187, Exhibit 22); *see also* Transcript of Class Certification Hearing (Doc. 261 at 36); Affidavit of Ronald E. Gots, M.D., Ph.D. (Doc. 77 at 5). Obviously, symptomology and illnesses listed can be caused by factors other than organophosphate poisoning. *See* Deposition of Dr. Leonard Cosmo (Doc. 234 at 25, 29, 31).

**16.** Because the court concludes that class certification is inappropriate for this reason, the court needs not address the typicality and adequacy of representation requirements. The court notes, however, that it is unlikely that Plaintiffs would be able to satisfy these requirements, either, given the disparity in their individual claim of injuries and damages. *See Georgine*, 83 F.3d at 632; *Reilly*, 965 F.Supp. at 600; *Puerto Rico v. M/V Emily S.*, 158 F.R.D. 9, 14–15 (D.P.R.1994).

### 1.

Here, the Plaintiffs define the class as the owners or operators of tropical fish farms "to which *malathion product* was directly or indirectly applied causing death, deformity, or other damage to tropical aquatic life." (Doc. 187 at 15–16) (emphasis added). Thus as with the other two proposed classes, the proposed tropical fish farm class is vaguely defined to include damage from application of "malathion product," rather than Defendant's product used in the eradication program. Once again, the court concludes that this description is vague and results in an unmanageable class definition.[17] More significantly, as to this subclass, the Plaintiffs fail to demonstrate that the class is so numerous that joinder of all members is impracticable.

Plaintiffs' estimation of a class of several dozen to more than a hundred members is loosely formed from the statements of Mr. Hatfield and a review of a directory of the Florida Tropical Fish Farm Association, Inc., listing something over 100 commercial farms in the affected counties. *See* (Doc. 187, Exh. 25). From these sources, Plaintiff's expert, Russell L. Carr, Ph.D., opines that over fifty tropical fish farms were affected by the Medfly Eradication Program in 1997–1998. *See* (Doc. 189, Exh. 4 at ¶ 23). Although the witness appears qualified to address issues relevant to the effects of malathion on tropical fish, his personal knowledge of the particulars of the spraying and the harms claimed by any fish farm other than Mr. Hatfield's is practically non-existent. This court finds his estimation of the size of this class to be little more than speculation. Beyond this witness's extrapolations, there is very little to suggest that numerous fish farmers suffered harm as a result of this eradication program such that a class action is necessary. For instance, at deposition,

Dr. Carr testified that other than Jay's Tropical Fish, Inc. (Plaintiff James Hatfield's fish farm), and Terraqua (another fish farm identified by Plaintiff Hatfield in his deposition), he could not identify another fish farm that may have been similarly affected by malathion spraying or suffered a loss of a marketable product for any reason. *See* Deposition of Russell L. Carr, Ph.D. (Doc. 196 at 156–57). Plaintiffs do proffer evidence of three other fish farms in Hillsborough County whose owners or operators complained of damage or fish kills during the medfly spraying and whose farms were investigated by the USDA in August 1997. *See* Memoranda from Ronald G. Berger of the United States Department of Agriculture to Terry McGovern of the Florida Medfly Eradication Program (Aug. 14, 21, 28, 1997) (Doc. 187, Exh. 19). Beyond this there is only the vague testimony by the Mr. Hatfield that when he started experiencing problems on his fish farm, he sought to purchase tropical fish elsewhere and learned that other ("several—40, 50 different") farms were having similar problems. *See* Deposition of James William Hatfield (Doc. 84 at 35–38).

Even in a light most favorable to the Plaintiffs, their "proof" does not suggest widespread damage to fish farms from the medfly spraying in the affected counties. More significantly, Plaintiffs do not demonstrate that joinder is not an acceptable and viable alternative for those farms who claim harm from the Medfly Eradication Program.[18]

### 2.

Upon this conclusion, the court does not discuss in detail Plaintiffs' claims of commonality and predominance, typicality, and adequacy of representation or superiority with respect to the proposed class of tropical fish farmers. I would note that were this sub-

---

17. Defendants also object that the definition hinges upon a showing of causation. However, courts have rejected this argument upon sound reasoning. *See Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620 (5th Cir.1999) (citing *Forbush v. J.C. Penney Co.,* 994 F.2d 1101 (5th Cir.1993)), *cert. denied,* 528 U.S. 1159, 120 S.Ct. 1169, 145 L.Ed.2d 1078 (2000).

18. As evidenced by the record, I authorized Plaintiffs' counsel to initiate contact with any tropical fish farm owner or operator who complained of any damages as a result of the medfly spraying. *See* (Doc. 170). Either no such additional contact was initiated or there simply were no other fish farmers who complained of such damage. In either event, there is no showing of widespread harm beyond a few farms in Hillsborough County, Florida.

class shown to be so numerous as to make joinder impractical, it is possible that an affirmative finding could be made on these prerequisites to class certification. Despite the Defendants' urging to the contrary, a trial of this subclass would present far more common issues of fact and law and far fewer individualized issues than would the other subclasses. Moreover, if properly defined, this subclass would present a more manageable class action, and were the need and appropriateness of such a proceeding established, it might offer a superior remedy.[19]

## D.

### Issue Certification

Finally, the Plaintiffs urge that if the court declines to certify any or all of the proposed subclasses, it should nonetheless certify particular issues for class treatment pursuant to Rule 23(c)(4)(A), which provides in pertinent part: "When appropriate ... an action may be maintained as a class action with respect to particular issues ... and the provisions of this rule shall be construed and applied accordingly." Fed.R.Civ.P. 23(c)(4)(A). In particular, Plaintiffs specify seventeen issues for such class determination in their supplemental memorandum. Essentially, these issues relate to those core facts which the Plaintiffs claim are predominant in this suit, the matter of wilfulness, general causation issues, and certain legal defenses going to the entirety of the claims. *See* (Doc. 187 at 53–54). Although not well pleaded, Plaintiffs propose a class disposition of these factual issues. As part of this class proceeding, the legal defenses of government emergency, government contractor, and the state of the art defense would be resolved. Were the Plaintiffs to prevail in this class proceeding, multiple separate trials in this or other courts would follow on the remaining issues pertinent to each subclass.

In opposition, Defendants again argue that the allegedly common and predominant factual issues are neither common nor predominant and are otherwise so inextricably intertwined with other highly individualized issues like exposure, proximate causation, comparative fault, and damages, that a Rule 23(c)(4)(A) class is inappropriate as such a proceeding would be unwieldy.

▮▮▮▮ "[Rule 23(c)(4)(A) ] is intended to advance judicial economy by permitting adjudication of any issues common to the class even though the entire litigation may not satisfy the requirements of Rule 23." *Emig v. Am. Tobacco Co.*, 184 F.R.D. 379, 395 (D.Kan.1998) (citing 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1790). Class-wide determination of certain issues, particularly in mass tort litigation, may serve the court's interest in judicial economy and efficiency and conserve the resources of the parties. *See In re Copley Pharm., Inc.*, 161 F.R.D. 456, 466–67 (D.Wyo.1995); *see also Simon v. Philip Morris, Inc.*, 200 F.R.D. 21, 29 (E.D.N.Y.2001). The relevant inquiry under this rule is whether resolution of particular common issues "would materially advance the disposition of the litigation as a whole." *Emig*, 184 F.R.D. at 395 (quoting *Harding*, 165 F.R.D. at 632). However, certification is improper if "noncommon issues are inextricably entangled with the common issues, or ... the uncommon issues are too unwieldy or predominant to be handled adequately on a class action basis." *Emig*, 184 F.R.D. at 395 (quoting 7B Charles A. Wright, et al., *Federal Practice and Procedure* § 1790).

While Rule 23(c)(4)(A) is less than clear on this point, it does not work to authorize a standalone class irrespective of the other re-

---

19. As Defendants' pleadings illustrate, the varied circumstances of this eradication program pose practical and legal problems which make class certification difficult even with this subclass. However, it appears to me that with this subclass, the issues of exposure, causation, and damages would present more common issues for consideration. The matter of exposure would be far less of a subjective inquiry. Causation would clearly be a more common consideration. Certain of the affirmative defenses which raise the specter of a highly individualized inquiry would appear unavailable on this claim. As recognized by the Defendants' own expert, even the matter of damages would be more formulaic. *See* Report of Dr. Frederick Raffa (Doc. 230, Exh. 1 at 5–6). While I do not recommend such a class at present, it is possible that with further development, such a class might be possible.

quirements of the rule. Here, I have determined that as to the subgroups presently proposed, no class would be appropriate under Rule 23(a) chiefly because of definitional problems and the myriad of highly individualized issues inherent in this litigation. Additionally, I have concluded that there is no predominance to support the Rule 23(b)(3) classes. Nevertheless, Plaintiffs contend that an issue certification class is appropriate because resolution of the identified issues will measurably advance the final disposition of the litigation. Before discussing the practical considerations of such a class, some discussion of the interplay between subsection 23(c)(4)(A) and subsections 23(a) and 23(b) is necessary.

As reflected in the parties' arguments, the courts are not in agreement on the relationship between these subsections. Plaintiffs' view of the appropriate interplay between these provisions is as expressed by the court in *In re Tetracycline Cases*, 107 F.R.D. 719 (W.D.Mo.1985). There the court reasoned,

> If the requirement under Rule 23(c)(4)(A) was not only that there be one or more issues which met the Rule 23(a) tests for commonality, typicality and adequacy of representation, but also that those issues "predominate," in the usual Rule 23(b) sense, when compared with *all* the issues in the case, there would obviously be no need or place for Rule 23(c)(4)(A).... I believe, accordingly, that the appropriate meaning of Rule 23(b)'s predominance requirement, as applied in the context of a partial class certification request under Rule 23(c)(4)(A), is simply that the issues covered by the request be such that their resolution (as a class matter) will materially advance a disposition of the litigation as a whole. In applying this test the court must obviously consider the nature of the other potential issues in the litigation; but, to me at least, the ultimate analytical process followed in that regard is quite different than in the usual application of this part of Rule 23(b).

*Id.* at 727 (emphasis in the original); *see also Emig*, 184 F.R.D. at 394–95 (the rule "authorizes certification even if common issues do not predominate over the individual questions because the common issues can be separated by the court and certified for independent class treatment.") (citing *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir.1996)). Defendants, however, cite to other courts which have required Plaintiffs to meet 23(a) and (b) requirements, even for issue certification under 23(c)(4)(A). *See Castano*, 84 F.3d at 745 n. 21 ("The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial."); *Cent. Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir.1993) (quoting *In re A.H. Robins Co.*, 880 F.2d 709 (4th Cir. 1989)); *Arch v. Am. Tobacco Co.*, 175 F.R.D. 469, 496 (E.D.Pa.1997); *Harding*, 165 F.R.D. at 632 ("Certification under Rule 23(c)(4)(A) must comply with the other applicable provisions of Rule 23."); *see also In re Telectronics Pacing Sys., Inc.*, 168 F.R.D. 203, 220 (S.D.Ohio 1996).

■ In light of the practical considerations set forth below, I find it unnecessary to render an opinion or recommendation on which is the correct view of the proper interplay between these provisions of the rule.[20] Upon close scrutiny, it is clear to me that Plaintiffs cannot meet even the less stringent standard that, regardless of the matter of predominance, class-wide determination of the common issues would measurably advance the litigation. Because of the circumstances of the eradication program, there are few, if any, actual class-wide issues. While some of the factual issues of this litigation are broader than others, were the court to undertake to litigate even such broad issues as whether the Defendants breached applicable standards of care in storing the Fyfanon

---

**20.** I tend to believe that the views expressed in *In re Tetracycline Cases* and *Emig* are correct if Rule 23(c)(4)(A) is to have any vitality. However, if the view expressed in *Castano* is correct, then there can be no certification of an issues class here related to either the personal injury or property damage subclasses because Plaintiffs cannot satisfy the predominance requirement of Rule 23(b).

so that it overheated or whether the Fyfanon supplied was a hazardous or defective product, because of the varied circumstances, it would be necessary to further refine and subgroup any class and to conduct mini-trials of related circumstances in order to manage the litigation effectively. Moreover, given the nature of the Defendants' affirmative defenses and the potential that other parties might need to be joined in the litigation, the highly individualized nature of the remaining issues, and the potential for significant Seventh Amendment problems to arise, little overall benefit would result. In my view, there is too little to gain to warrant the certification of any issues for class resolution.

To illustrate these conclusions, on the broad issues of whether Defendants stored the Fyfanon in conformity with a particular standard of care or shipped a defective product, given the circumstances in this case, the representational plaintiff would likely have to trace the Fyfanon from its original shipment through its use in the aerial spraying to satisfy the burden of proof. Here, the circumstances of Defendants supplying Fyfanon to the State were varied from the outset. At the initial stages in the program, some of the Fyfanon was supplied by Lee County Mosquito Control, and the FDACS also supplied malathion from its own supplies. The Fyfanon supplied thereafter was manufactured at different times and shipped for storage at three different storage facilities under different conditions and there held for differing lengths of time before being delivered to Florida in numerous different shipments at different times there to be stored by the State pending its use. In addition to these circumstances, the medfly bait was sprayed in different areas in nine counties at different times during two years, and the aerial sprays were numerous; for example, Lee County alone flew over 150 "missions." In these circumstances, that Plaintiffs can universally prove that it is hot in Texas, Georgia, and Florida in the summer is only the "tip of the

iceberg" in the Plaintiffs' proof that the Defendants were negligent or that the Fyfanon supplied was defective and caused harm to the Plaintiffs. In all probability, even on these so-called common issues, the factual circumstances would require either further subgrouping of class members or numerous mini-trials within the class or both to effectively manage the trial of class issues and to establish a given Plaintiff's right to proceed further. Every such refinement of the class would no doubt complicate the already formidable task a jury would face in such litigation and detract from its manageability.

As a further example, Plaintiffs suggest that certain broad issues of causation and harm should also be litigated on a class-wide basis. However, as discussed above, the factual matters which support the Plaintiffs' theories of causation and harm are highly enmeshed in the particularized factual circumstances surrounding each shipment, its handling, each spraying, and the nature of each individual class members' exposure. In my view, the proof considerations underlying both issues appear entirely inseparable from consideration of the individual claimants. This is especially true when certain defenses are considered. For instance, in light of Defendants' claim of comparative fault, pre-existing conditions, and lack of mitigation on the part of the claimants—each highly individualized defenses—there appears no way to resolve any issues of causation or harm for the class as a whole.

When analyzed in light of the known circumstances and the proffered evidence, I find most of the so-called common fact issues identified by the Plaintiffs' to be so entwined with uncommon considerations that a Rule 23(c)(4)(A) certification appears inappropriate under any standard.[21]

There are additional reasons why I conclude the proposed procedure would not materially advance the disposition of the lit-

---

**21.** In fairness to the Plaintiffs, perhaps there are some narrow, common issues. For example, their claims of negligence based on the alleged failure to warn governmental agencies may present a more common claim. Were such allegations to survive legal challenge, they would likely present common issues that might be amenable to class resolution. So too, certain of Defendants' defenses would benefit from class resolution. However, such issues also appear amenable to resolution by summary judgment procedures as well, and in any event, their resolution would advance the overall litigation hardly at all.

igation as a whole. By Plaintiffs' proposal, *numerous* issues would remain to be resolved in this or another court after the trial of the class issues. Under any of the proposed subclasses, the remaining issues on each count would involve many highly individualized inquiries. This consideration calls into question whether such an issues class would be a superior means of advancing this litigation and whether such a procedure would ultimately lead to trials conducted in violation of the Seventh Amendment.

As discussed above, a key consideration of the matter of superiority is manageability. While a narrowly crafted issues class might well be manageable, the tens, hundreds, or perhaps thousands of trials thereafter would pose considerable difficulties on the courts. When the litigation is considered as a whole, manageability is a significant concern. Regarding my concerns about the Seventh Amendment, the following quotation is instructive:

> The Seventh Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues. Thus, [the] Constitution allows bifurcation of issues that are so separable that the second jury will not be called upon to reconsider findings of facts by the first:
>
>> [T]his Court has cautioned that separation of issues is not the usual course that should be followed, and that the issue to be tried must be so distinct and separable from the others that a trial of it alone may be had without injustice. This limitation on the use of bifurcation is a recognition of the fact that inherent in the Seventh Amendment guarantee of a trial by jury is a general right of a litigant to have only one jury pass on a common issue of fact.

*Castano,* 84 F.3d at 750 (quoting *Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 318 (5th Cir.1978)). In this court's view, given the nature of the Plaintiffs' theories of recovery and the defenses asserted by Defendants, it is most unlikely that the court could fashion an issues class as proposed by Plaintiffs which would decide issues so separable that a later jury would not be called upon to recon-

sider the earlier findings of fact in some fashion. As demonstrated in *Castano,* the assertion of a comparative negligence defense in circumstances such as these practically guarantees that subsequent juries will impermissibly reconsider findings of fact made by the first jury. *See Castano,* 84 F.3d at 751 (citing *In re Rhone–Poulenc Rorer, Inc.,* 51 F.3d 1293, 1303 (7th Cir.1995)). Even if it were possible for the court to fashion an issues class with very narrowly drawn issues so as to avoid the Seventh Amendment concerns, in doing so, the court would likely negate any widespread benefit intended by this rule.

It is my conclusion that while the Plaintiffs proposal of a Rule 24(c)(4)(A) class has certain facile appeal, in actuality, such a process would only serve to lengthen and complicate the litigation given the number of separate trials that might follow. In all likelihood, absent extraordinary efforts by the later courts, such a procedure as is proposed by the Plaintiffs would also violate Seventh Amendment principals. In these circumstances, the court cannot recommend the certification of an issues class as proposed by Plaintiffs.

### IV.

This Report and Recommendation does not in any way speak to the merits of the Plaintiffs' claim. Indeed, Plaintiffs proffer evidence suggesting the Defendants knowingly stored Fyfanon at temperatures above that recommended by its own label and its own literature. Super-heated malathion can degrade, and resulting impurities do appear to render the substance more toxic and potentially harmful to humans, aquatic life, and property. Whether some or all of the product became defective and hazardous, as alleged by Plaintiffs, remains an arguable point. Undeniably, thousands of gallons of the product were shipped to Florida for use in this Medfly Eradication Program. A number of individuals and some property have evidenced harm which could have been caused by the aerial spraying of this product. These issues are properly left for further consideration by the court on subsequent pleadings or at trial. The recommendation

made herein is only that such issues are not, at present, appropriately raised by way of a class action.

As set forth herein, the proposed subclasses are poorly defined and overbroad. The medical monitoring class is not demonstrated to be appropriate or manageable. In its present configuration, the personal injury class is inappropriate by reason of a lack of predominance of common issues and a corresponding lack of superiority and manageability. Indeed, the individualized issues in such claim overwhelm any issues which might otherwise be labeled common. While the fish farm class would be considerably more manageable were it framed and constituted properly, the Plaintiffs have failed to demonstrate the need for the class action remedy in regard to the few farms arguably damaged by the spraying. Because joinder appears practicable, no class certification is necessary for this group of claimants.

For the foregoing reasons, it is RECOMMENDED that Plaintiffs' Motion to Certify Class (Doc. 37), as supplemented (Doc. 187), be DENIED.

### NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge. 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 72; *see also* Fed.R.Civ.P. 6; M.D. Fla. R. 4.20.

June 6th, 2001.